[Cite as *State ex rel. DeCapua Ents., Inc. v. Wolfe*, 2021-Ohio-3987.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. DeCapua Enterprises, Inc., | : | |
| Relator, | : | |
| | : | No.  20AP-174 |
| v. | : | (REGULAR CALENDAR) |
| Micaela L. Wolfe et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on November 9, 2021

**On brief**: *Michael Soto*, for relator.

**On brief**: *Larrimer and Larrimer,* and *Thomas L. Reitz,* for respondent Micaela L. Wolfe.

**On brief**: *Dave Yost*, Attorney General, and *Anna Isupova,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

BROWN, J.

{¶ 1}  Relator, DeCapua Enterprises, Inc., has filed this original action seeking a writ of mandamus to order respondent, Industrial Commission of Ohio ("commission"), to vacate an order of its staff hearing officer ("SHO") that awarded temporary total disability ("TTD") compensation to respondent, Micaela L. Wolfe ("Wolfe" or "claimant"), and authorized payment for additional medical services in connection with Wolfe's allowed conditions.

{¶ 2} This court referred the matter to a magistrate pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ.

{¶ 3} Relator has filed objections to the magistrate's decision, arguing the magistrate erred in: (1) wrongly applying pregnancy discrimination law and overstating the commission's discretion, (2) misapplying the facts and law regarding the injured worker's eligibility to receive TTD compensation, (3) ignoring the Supreme Court of Ohio's holding in *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649 (1994), and (4) accepting the SHO's approval of an electromyography ("EMG") of the lower extremity.

{¶ 4} We initially address relator's (second) objection challenging the magistrate's conclusion that the record contains some evidence upon which the commission could rely to support an award of TTD compensation. Relator contends the medical evidence relied upon by the commission is contrary to various legal principles, including the failure to differentiate between allowed and non-allowed conditions and a reliance on internally inconsistent medical reports.

{¶ 5} Here, the SHO determined the injured worker was experiencing left lower extremity issues that had worsened in spite of surgery and other treatment modalities. The SHO noted that, after Wolfe's "initial surgery in April, 2017, the Injured Worker developed Left Lower Extremity DVT, which is an allowed condition in this claim." (SHO Order at 2.) The SHO further found that, despite being initially released to return to work, Wolfe's lower left extremity issues "continued and worsened, causing her to seek treatment at the emergency room on 05/01/2017." (SHO Order at 2.)

{¶ 6} In granting the claimant's request for TTD compensation, the order of the SHO cited the evidence relied on, including: (1) a C-9 dated 1/29/2019 from Dr. Jonathan Feibel (the physician who performed surgery on claimant in 2017), (2) a treatment note, dated 1/28/2019, from Lacie Baker, PA-C (noting in part "[l]eft ankle swelling" and "pain over the peroneal tendons on the left," as well as a physician's statement to Baker that MRI findings indicated "some of the signal in the tendons could be scarring from the previous surgery but some however could be new tearing at the tendon"), (3) the January 11, 2019 MRI Interpretive Report (noting split-tear of the tendon), (4) the 2/20/2019 MEDCO-14 of

Dr. Feibel, and (5) three MEDCO-14 forms completed by Dr. Jason A. Reed, dated respectively 6/25/2019, 10/16/2019 and 1/2/2020, indicating Wolfe's conditions of peroneal tendon tear and sprain of left ankle were conditions causing temporary disability.

{¶ 7}    The decision of the magistrate sets forth detailed findings of fact based on the stipulated record, including the finding that, in the interim between the claimant's appeal of the order of the district hearing officer and the hearing before the SHO, "Wolfe underwent further examination by Dr. Reed, who summarized his treatment with the conclusion that Wolfe's symptoms had worsened since her surgery."  (Appended Mag. Decision at ¶ 47.)  In addressing the "conflicting evidence" with respect to Wolfe's medical treatment and the conclusions of the examining physicians, the magistrate concluded the commission had full discretion to rely on the reports of Drs. Reed and Feibel (in favor of those offered by Dr. Michael Rozen and Dr. Paul Freedman), and to rely on Dr. Reed's "continued assessment that Wolfe could not return to work based upon the allowed conditions."  (Appended Mag. Decision at ¶ 60.)

{¶ 8}    On review, we conclude, as did the magistrate, there was some medical evidence supporting the commission's conclusion that Wolfe was unable to return to work due to her allowed conditions.  Accordingly, we find unpersuasive relator's contention the magistrate misapplied the facts and law in addressing the commission's decision to award the claimant TTD compensation, and we overrule relator's second objection.

{¶ 9}    Under its third objection, relator contends the magistrate ignored the Supreme Court's decision in *Eberhardt*.  Specifically, relator cites language from that decision indicating the commission's discretion in determining the weight and credibility of the medical reports admitted into evidence "is not unbounded," and that "there must be some reasonable basis for the commission's rejection of a physician's finding." *Eberhardt* at 655.  According to relator, the rejection of the reports of Drs. Rozen and Freedman are violative of *Eberhardt* because, unlike the evidence cited by the SHO, "the opinions of these physicians are supported by the facts and Stipulated Evidence."  (Relator's Objs. at 14.)

{¶ 10} In context, the passages cited by relator address the Supreme Court's recognition that "contradictory or equivocal statements by the same physician cannot, as a matter of law, support an award of compensation," *Eberhardt* at 656, and that "equivocal medical opinions are not evidence." *Id.* at 657.  This court has recognized that *Eberhardt*

itself "merely stands for the proposition that, 'where a physician renders an ambiguous opinion regarding a claimant's medical condition but thereafter clarifies the ambiguity, the Industrial Commission may not revive the ambiguity as a basis for rejecting the physician's opinion.' " *State ex rel. Ward v. Dorman Prods.,* 10th Dist. No. 05AP-28, 2005-Ohio-5425, ¶ 4, quoting *Eberhardt* at paragraph two of the syllabus.

{¶ 11} While the magistrate in this action acknowledged the record was "replete with conflicting evidence," the magistrate further recognized the commission "remains the arbiter of weight and probative value of such evidence," and that it was not the magistrate's role in a mandamus action to "reweigh the evidence" and reject the reports of Drs. Reed and Feibel in favor of those of Drs. Freedman and Rozen. (Appended Mag. Decision at ¶ 60.) We agree and find unpersuasive relator's contention that the reports relied on by the SHO, and discussed by the magistrate, run contrary to the holding in *Eberhardt.* Finding no merit with relator's argument, we overrule the third objection.

{¶ 12} Under its first objection, relator contends the magistrate erred in considering state and federal pregnancy discrimination law when addressing the issue of voluntary abandonment. Relator notes the magistrate raised pregnancy discrimination related concerns in the context of analyzing the Supreme Court's decision in *State ex rel. Klein v. Precision Excavating & Grading Co.*, 155 Ohio St.3d 78, 2018-Ohio-3890, ¶ 29, in which the Supreme Court overruled two prior decisions (*State ex rel. Reitter Stucco, Inc. v. Indus. Comm.*, 117 Ohio St.3d 71, 2008-Ohio-499, and *State ex rel. OmniSource Corp. v. Indus. Comm.*, 113 Ohio St.3d 303, 2007-Ohio-1951), and held in part: "[W]hen a workers' compensation claimant voluntarily removes himself from his former position of employment for reasons unrelated to a workplace injury, he is no longer eligible for temporary-total-disability compensation, even if the claimant remains disabled at the time of his separation from employment."

{¶ 13} Relator maintains none of the parties in the instant action "ever grounded its position" on the injured worker's pregnancy, and that "any discussion or application of pregnancy discrimination law is irrelevant to the issue before the Court." (Relator's Objs. at 5-6.) Relator further contends the SHO's conclusion that Wolfe had not abandoned the workforce is not supported by any evidence.

{¶ 14} While we do not find the magistrate's analysis of pregnancy discrimination law dispositive, we disagree with relator's argument that there is no evidence to support the SHO's finding Wolfe had not abandoned the workforce. In this respect, the magistrate noted the commission "addressed the question of voluntary abandonment and assessed the evidence addressing the interplay between physical impact of the allowed conditions and a subsequent pregnancy in weighing whether one or the other had prevented Wolfe from returning to work." (Appended Mag. Decision at ¶ 74.) We agree, and find the record supports the commission's rejection of relator's assertion that claimant voluntarily abandoned her employment.

{¶ 15} Here, while the SHO recognized the fact "the Injured Worker was pregnant and did have a baby," the SHO further concluded "her issues due to surgery, but occurring before her pregnancy[,] are documented in the claim file." (SHO Order at 2.) In support of the determination Wolfe had not voluntarily abandoned the workforce based on worsening medical issues due to surgery, the SHO cited the evidence relied on including the treatment note of Natalie Wyss, PA-C, the treatment report of Lacie Baker, PA-C, as well as the initial report of Dr. Reed.

{¶ 16} While we find the magistrate's discussion of state and federal discrimination law unnecessary to the issues presented, we agree with the magistrate's ultimate conclusion there was some evidence to support the SHO's determination that Wolfe's absence from her former position of employment was related to her allowed conditions (and therefore the commission did not abuse its discretion in rejecting relator's voluntary abandonment argument). We therefore sustain relator's first objection to the limited extent we do not adopt the portion of the magistrate's conclusions of law addressing federal and state pregnancy discrimination law, but we otherwise overrule the objection.

{¶ 17} In its final objection, relator contends the magistrate erred in accepting the SHO's approval of the EMG of the lower extremity. The SHO granted the request for an EMG, finding it "reasonable, necessary and appropriate for management of the allowed conditions," and further noting "the Injured Worker is experiencing left lower extremity issues which have worsened, in spite of surgery and other treatment modalities being performed." (SHO Order at 1.) Relator's objection on this point reiterates the same argument presented and rejected by the magistrate (i.e., relator's claim that the

commission's approval of the EMG violated the three-prong test in *State ex rel. Miller v. Indus. Comm.,* 71 Ohio St.3d 229 (1994)). The magistrate addressed and rejected that argument, deeming it an invitation to "reweigh the medical opinion evidence that the requested EMG was medically necessary and related to the allowed conditions." (Appended Mag. Decision at ¶ 61.) Finding no error with determination, we overrule relator's fourth objection.

{¶ 18} Following an independent review of this matter, we find the magistrate has properly determined the facts and we adopt the magistrate's findings of fact. We also adopt the magistrate's conclusions of law except for the discussion as to federal and state pregnancy discrimination law. For the reasons set forth above, we sustain in part and overrule in part relator's first objection, and we overrule relator's second, third, and fourth objections. In accordance with the magistrate's recommendation, we deny relator's request for a writ of mandamus.

*Objections sustained in part and overruled in part;*
*writ of mandamus denied.*

DORRIAN, P.J., and MENTEL, J., concur.

_____

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. DeCapua Enterprises, Inc., | : | |
| Relator, | : | |
| v. | : | No. 20AP-174 |
| Micaela L. Wolfe et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

MAGISTRATE'S DECISION

Rendered on March 16, 2021

*Michael Soto,* for relator.

*Larrimer and Larrimer,* and *Thomas L. Reitz,* for respondent Micaela L. Wolfe.

*Dave Yost,* Attorney General, and *Douglas R. Unver,* for respondent Industrial Commission of Ohio.

IN MANDAMUS

{¶ 19} Relator, DeCapua Enterprises, Inc., brings this original action seeking a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate an order of the commission staff hearing officer ("SHO") that awarded temporary total disability ("TTD") compensation to respondent Micaela L. Wolfe and authorized payment for additional medical services in connection with Wolfe's allowed conditions. Findings of Fact:

{¶ 20} 1. DeCapua is a temporary staffing service that participates in Ohio's workers' compensation system as a self-insured employer.

{¶ 21} 2. DeCapua employed Wolfe and, for the period relative to the claim at issue, assigned Wolfe as an optical lab technician to a facility in Lockbourne, Ohio. (Stip. at 1.)

{¶ 22} 3. Leaving a work-related meeting on September 27, 2016 at the facility where she was assigned, Wolfe slipped on a wet floor, and suffered leg injuries. (Stip. at 1, 16, 75, 104, 112, 137.)

{¶ 23} 4. DeCapua initially certified Wolfe's claim which was allowed for "Sprain Left Ankle [], Contusion Right Knee [], Left Ankle Peroneal Tendon Tear." (Stip. at 14.)

{¶ 24} 5. DeCapua's complaint alleges that DeCapua commenced paying TTD benefits to Wolfe for the period from September 28, 2016 to February 1, 2018. (Complaint at 2.).

{¶ 25} 6. Orthopedist Jonathan B. Feibel, M.D., examined Wolfe and produced a report dated December 20, 2016. (Stip. at 16.) Dr. Feibel reviewed an MRI and found it

consistent with left peroneal tendinitis and peroneal tendon tearing. He proposed use of an immobilizing boot followed by review of surgical options after four weeks. (Stip. at 16.)

{¶ 26} 7. On January 17, 2017, Laci Baker, a physician assistant in Dr. Feibel's office, signed a report with the following recommendation:

> Patient has failed conservative treatment and therefore I have recommended surgical intervention which would include peroneal tendon debridement with repair. I discussed with the patient the risks, benefits and complications of the surgery. She understands these risks and wishes to proceed therefore we will ask for approval through BWC and schedule it in the near future. She will followup [sic] postoperatively. She will call if any problems arise in the interim.

(Stip. at 18.)

{¶ 27} 8. Dr. Feibel performed surgery on April 5, 2017. (Stip. at 22.) Surgery included resolution of "a very complex tendon tear" and debridement. (Stip. at 22-23.)

{¶ 28} 9. Dr. Feibel certified Wolfe temporarily and totally disabled after the surgery. (Stip. at 28-29.)

{¶ 29} 10. Wolfe experienced post-surgery calf pain and underwent a veinous duplex exam on April 11, 2017 which revealed acute deep vein thrombosis of the left peroneal vein. (Stip. at 30-32, 36.)

{¶ 30} 11. DeCapua additionally recognized Wolfe's claim for deep vein thrombosis, lower left extremity. (Stip. at 148.)

{¶ 31} 12. On July 14, 2017, Dr. Feibel's physician assistant recommended that Wolfe commence physical therapy, and Dr. Feibel again certified Wolfe temporarily and totally disabled. (Stip. at 53-56.)

{¶ 32} 13. On December 22, 2017, Dr. Feibel again examined Wolfe, who reported ongoing pain in her left ankle, associate bruising, and red blotchy skin. Dr. Feibel observed that Wolfe reported pursuing her physical therapy and that she reported being six months pregnant. (Stip. at 58.) Dr. Feibel's diagnosis continued to be sprain of unspecified ligaments in the left ankle and peroneal tendonitis of the left leg. Dr. Feibel recommended continuing physical therapy and expressed concern that Wolfe had developed reflex sympathetic dystrophy ("RSD") in her left ankle.

**{¶ 33}** 14.   Wolfe underwent a functional capacity evaluation ("FCE") on January 19, 2018.  Kevin Jones, physical therapist, reported to Dr. Feibel as follows:

> The above-referenced client was referred to our facility for a functional capacity evaluation which was conducted on January 19, 2018. The results of the evaluation are contained in the attached report. The XRTS FCE testing system consists of multiple components which rely on distraction-based testing methods during repeated observations to assist in the classification of effort.
>
> Testing was performed per the request of the referral source to determine maximum abilities.
>
> A summary of the findings are as follows:
>
> **Result:**
> The overall classification of effort is **Invalid** due to the client, Micaela Queen, **performing inconsistently** during a repeated measures protocol.
>
> Maximum weight achieved to waist height = B 29.16 lbs.; Rt 29.16 lbs.; Lt 29.16 lbs.
> The client failed to give maximum voluntary effort during today's FCE. Therefore, it is undeterminable at this time safe, maximum lifting capabilities and/or other functional capabilities.
>
> **Reasoning for Invalid Categorization**
> There is an absence of correlation between lifts of unmarked steel bars and the corresponding lifts on the XRTS Lever Arm. Overall Percent Change = 43.0%
>
> **Additional Supportive Reasoning for Invalid Categorization**
> Breakaway/Cogwheeling was observed during the manual muscle testing.
>
> High pain reports during and/or following FCE are inconsistent with minimal or no demonstrated pain behaviors.

(Emphasis sic.) (Stip. at 60.)

{¶ 34} 15. Based in part on the FCE report, Dr. Feibel's office, over the signature of Natalie Wyss, physician assistant, produced a report of work ability dated February 2, 2018, releasing Wolfe to full duty without restrictions effective immediately.  (Stip. at 72-73.)

{¶ 35} 16. On February 12, 2018, Michael Rozen, M.D., examined Wolfe on behalf of DeCapua.  Dr. Rozen reported that Wolfe informed him that she was 35 weeks pregnant, was not undergoing active treatment for her workplace injury, and had not scheduled follow-up appointments until conclusion of her pregnancy.  Dr. Rozen opined that Wolfe had reached maximum medical improvement ("MMI") on her allowed conditions. (Stip. at 81.)

{¶ 36} 17. Wolfe then underwent a further examination at Dr. Feibel's office on April 23, 2018.  Physician Assistant Wyss opined that the office would seek an additional MRI examine to evaluate Wolfe's injuries prior to determining if the office agreed with Dr. Rozen's MMI determination.  (Stip. at 84.)  Dr. Feibel did not issue a new opinion at this time to contravene his February 2, 2018 release to work.

{¶ 37} 18. The commission eventually granted authorization for the requested MRI examination.  (Stip. at 102-03.)

{¶ 38} 19. Wolfe applied for a permanent partial disability ("PPD") award on August 16, 2018 and the commission eventually granted ten percent PPD.  (Stip. at 94, 158-59.)

{¶ 39} 20. Wolfe underwent an MRI on January 11, 2019.  The radiologist's report stated as follows:

> [One] There are MRI findings most compatible with a longitudinal split-tear of the retromalleolar and inframelleolar portion of the peroneus brevis tendon spanning approximately 3 cm in length. This is not associated with any significant tenosynovitis and is of uncertain clinical significance. There is probable postoperative scarring involving the superior peroneal retinaculum. The peroneus longus tendon appears grossly within normal limits allowing for susceptibility artifact from postsurgical changes in the retromalleolar and inframalleolar region.
>
> [Two] No ligament injury or osteochondral defect is seen.

(Stip. at 111.)

{¶ 40} 21. Dr. Feibel examined Wolfe again on January 28, 2019 and recommended further treatment including an updated EMG study to evaluate for RSD. (Stip. at 115.) Based on this examination and the prior MRI, Wolfe filed on March 6, 2019 (signature date February 28, 2019) a motion for further treatment and referral, and for TTD compensation for the period January 28 to April 1, 2019. (Stip. at 120-21.) DeCapua opposed the motion. (Stip. at 128.) Dr. Feibel produced a February 20, 2019 work ability report at this time which is illegible in the record but the parties treat in argument as supporting the TTD application. (Stip. at 118-19.)

{¶ 41} 22. Paul Freedman, M.D., examined Wolfe on March 29, 2019 and reviewed her records, issuing a report dated July 30, 2019. Dr. Freedman concluded that the requested services were directed at non-allowed conditions, including chronic regional pain syndrome ("CRPS," the alternative term for RSD previously discussed in the file), that the allowed conditions had resolved, and that light-duty restrictions proposed by Dr. Feibel were inconsistent with his findings. (Stip. at 138-39.)

{¶ 42} 23. Wolfe submitted a BWC notice of change of treating physician of record on June 24, 2019. The form does not specify a previous treating physician and identifies the new physician as Jason A. Reed, D.O. (Stip. at 134.)

{¶ 43} 24. Wolfe was examined by Dr. Reed on June 24, 2019. (Stip. at 131-33.) Dr. Reed produced a work ability report dated June 25, 2019, stating: "Patient will continue off work until EMG and follow up is completed." (Stip. at 135-36.)

{¶ 44} 25. Dr. Reed produced another work ability report dated October 16, 2016 with the same conclusion, pursuant to an exam conducted on October 14, 2019. (Stip. at 154-57.) Dr. Reed reported his impression from this exam as "[s]train of muscle(s) and tendon(s) of peroneal muscle group at lower leg level; left leg * * * [s]prain of unspecified ligament of left ankle. * * * Patient states 2 weeks ago fell due to knee giving out and ankle went numb. At this time patient is to continue off work. Patient has EMG hearing next week. We will see patient back after hearing." (Stip. at 155.)

{¶ 45} 26. Dr. Freedman updated his report with an addendum dated November 1, 2019 addressing Dr. Reed's office notes, and opposing Dr. Reed's recommendation for further testing because Dr. Freedman deemed these tests directed at non-allowed

conditions.   Dr. Freedman continued to opine that the allowed conditions had resolved.  (Stip. at 160-63.)

{¶ 46} 27.  Pursuant to DeCapua's opposition to Wolfe's various motions, a district hearing officer ("DHO") issued an order November 5, 2019 denying Wolfe's application for TTD for the closed period of January 28 to April 1, 2019, and June 24, 2019 through the date of hearing.  (Stip. at 165-67.)  The DHO also denied Wolfe's request for authorization of a further EMG of her left leg.  The DHO further summarized Wolfe's testimony at the hearing as follows:

> [T]he Injured Worker testified that she did not return to work in February 2018, noting that she was eight months pregnant at the time and stating that no one would hire a woman who was eight months pregnant. The Injured Worker testified further that she gave birth in March 2018 and since that time has been a stay-at-home mother. The Injured Worker testified further that she has not returned to work or looked for work since March 2018, as she does not feel capable of returning to any employment due to her allowed left lower extremity conditions. Despite this testimony, the District Hearing Officer finds insufficient persuasive medical proof on file of any vocational restrictions caused by the allowed conditions between 02/03/2018 and 01/27/2019. Based upon these factors, the District Hearing Officer is persuaded by the Employer's argument, presented by counsel at hearing, and finds that the Injured Worker has abandoned the workforce and is thus ineligible for temporary total disability compensation. These findings are also based upon the Employer's C-256 Self-Insuring Employer Notice and Request for Information for C-92/C-92A Application filed 08/27/2018 and Adjudications Before the Ohio Industrial Commission Memo D5.

> Authorization is denied for a left lower extremity EMG. The District Hearing Officer finds that the requested left lower extremity EMG is not related to, reasonable or necessary for treatment of the allowed conditions of the claim, or for diagnostic purposes under the claim. The District Hearing Officer finds that when the Injured Worker was evaluated by Lacie Baker, P.A., on 12/22/2017, she was concerned that the Injured Worker had developed reflex sympathetic dystrophy in the left ankle. The District Hearing Officer finds that by the time the Injured Worker was evaluated by Ms. Baker on 01/26/2019, she found that most of the Injured Worker's pain

was related to her reflex sympathetic dystrophy and recommended the updated EMG study to evaluate for that reflex sympathetic dystrophy. Therefore, the District Hearing Officer finds that the Injured Worker's present complaints and examination findings are causally unrelated to the allowed industrial incident of 09/27/2016. These findings are also based upon Dr. Freedman's reports dated 07/30/2019 and 11/01/2019.

(Stip. at 166.)

{¶ 47} 28. Wolfe appealed the DHO's order and the appeal was scheduled for hearing before an SHO. In the interim, Wolfe underwent further examination by Dr. Reed, who summarized his treatment with the conclusion that Wolfe's symptoms had worsened since her surgery, and that Wolfe had not developed CRPS due to her pregnancy but rather due to a buildup of scar tissue due to injury and surgery in connection with the allowed conditions. (Stip. at 169-70.)

{¶ 48} 29. Dr. Reed completed a Physician's Report of Work Ability dated January 2, 2020, and certified that Wolfe was temporarily and totally disabled for the period of December 23, 2019 through February 24, 2020 and should remain off work due to pain. (Stip. at 173-74.)

{¶ 49} 30. The SHO issued an order mailed January 22, 2020 vacating the DHO's order and awarding TTD and approving an EMG of the left lower leg. (Stip. at 177.) The SHO found that Wolfe had not voluntarily abandoned her employment, and ultimately was not working because of the evolving and worsening allowed conditions: "While the Injured Worker was initially released to return to * * * work approximately 10 weeks after surgery, the Injured Worker's lower left extremity issues continued and worsened, causing her to seek treatment at the emergency room on 05/01/2017." (Stip. at 178.) The SHO further noted, as had the DHO, that Wolfe had not returned to work after February 2, 2018. (Stip. at 178.)

{¶ 50} The SHO's report relied on Dr. Feibel's work ability report dated February 20, 2019, the treatment notes of Physician Assistant Wyss dated April 23, 2018, the treatment notes of Physician Assistant Baker dated January 28, 2019, the results of the MRI reported

on January 11, 2019, the June 24, 2019 initial examination report from Dr. Reed, and Dr. Reed's work ability reports.  (Stip. at 177.)

{¶ 51} The SHO addressed DeCapua's voluntary abandonment arguments as follows:

> The Hearing Officer further finds that the Injured Worker was last paid temporary total compensation through 02/02/2018 and has not returned to work. The Hearing Officer notes that * * * on that date the Injured Worker was 8 months pregnant and that she gave birth in March, 2018. However, the Hearing Officer does not find persuasive the employer's counsel's assertion that the Injured Worker voluntarily abandoned her employment and is therefore not entitled to temporary total compensation. While it is well taken that the Injured Worker was pregnant and did have a baby, her issues due to surgery, but occurring before her pregnancy are documented in the claim file and noted above.

(Stip. at 178.)

{¶ 52} 31. DeCapua filed an appeal from the SHO's order, which the commission refused.  (Stip. at 242.)

{¶ 53} 32. DeCapua then moved for reconsideration of the commission's refusal, and by decision mailed March 17, 2020, the commission advised that it had failed to reach a majority decision with one commissioner abstaining, one commissioner opposed, and one supporting the request for reconsideration.  Under the rules of the commission, the SHO's order stood undisturbed.  (Stip. at 310-12.)

{¶ 54} 33. DeCapua filed its complaint in mandamus with this court on March 23, 2020.  The matter was duly briefed and argued before the magistrate on December 4, 2020, at which time the magistrate requested additional briefing from the parties due to the intervening enactment of S.B. 81, which addresses the law in Ohio governing voluntary abandonment of employment. Counsel have furnished the requested additional briefing.
Discussion and Conclusions of Law:

{¶ 55} DeCapua seeks a writ addressing the commission's award of TTD compensation and approval of additional treatment in the form of an EMG of the lower left leg.

{¶ 56} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 57} TTD compensation awarded pursuant to R.C. 4123.56 is compensation for wages lost when a claimant's injury prevents a return to the former position of employment. TTD compensation shall be paid to a claimant until one of four things occurs: (1) the claimant resumes work; (2) the claimant's treating physician provides a written statement that claimant is able to return to the former position of employment or comparable work; (3) work within the capabilities of the claimant is made available by the employer or another employer; or (4) the claimant reaches maximum medical improvement. R.C. 4123.56(A); *State ex rel. Ramirez v. Indus. Comm.*, 69 Ohio St.2d 630 (1982); *State ex rel. Cugini v. Timken Co.*, 10th Dist. No. 18AP-261, 2019-Ohio-3013, ¶ 25. In some cases, however, a worker's own actions, rather than the allowed conditions, may result in the worker's not being able to return to the workforce. *State ex rel. Rockwell Internatl. v. Indus. Comm.*, 40 Ohio St.3d 44 (1988). "In such cases, the injured worker is said to have voluntarily abandoned his former position of employment, thereby precluding his eligibility for TTD." *State ex rel. Baker v. Indus. Comm.*, 89 Ohio St.3d 376, 379-80 (2000). Thus, a claimant's complete abandonment of the entire workforce precludes the payment of TTD compensation altogether. *State ex rel. Honda of Am. Mfg. v. Indus. Comm.*, 10th Dist. No. 11AP-528, 2012-Ohio-3335, ¶ 34, citing *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.*, 29 Ohio App.3d 145 (10th Dist. 1985), and *Baker*.

{¶ 58} In arguing against the award of TTD in this case, DeCapua relies both on the concept of voluntary abandonment of employment and the premise that Wolfe did not meet her evidentiary burden of furnishing competent medical evidence of continuing TTD as required by Ohio Adm.Code 4123-5-18(D).  The magistrate notes at this point that the commission has never held that Wolfe has reached MMI, despite the medical evidence to that effect provided by Dr. Rozen.

{¶ 59} DeCapua argues the SHO erred in relying on Dr. Feibel's January 28, 2019 report, Physician Assistant Baker's office notes from the January 28, 2019 examination, and the left ankle MRI of January 11, 2019 in approving a further EMG test for Wolfe. DeCapua posits that Dr. Feibel is no longer Wolfe's physician of record after June 24, 2019 when she submitted her change of physician form and began seeing Dr. Reed.  DeCapua then asserts that Dr. Reed has never specifically requested the left-leg EMG approved by the SHO, because Dr. Reed actually favored a bilateral lower extremity EMG.  (Stip. at 131-33.)  DeCapua also points out that office notes of Physician Assistant Baker stated that Wolfe's pain was related to her possible RSD, which was a non-allowed condition, and that the requested EMG was therefore not related to an allowed condition.  Finally, DeCapua points out that Dr. Freedman's report was far more detailed and specific in opposing approval of the EMG because the test was directed at non-allowed conditions.

{¶ 60} DeCapua points out that Dr. Feibel had released Wolfe to full duty on February 2, 2018, ten months after surgery and nine months after the May 1, 2017 emergency room visit that revealed the deep vein thrombosis.  DeCapua points out that the record contains no medical discussion or evidence related to the deep vein thrombosis after Dr. Feibel's full-duty release on February 2, 2018.  With respect to the state of the evidence regarding Wolfe's medical treatment and conclusions of examining physicians that Wolfe was incapable of returning to her former position, the record is certainly replete with conflicting evidence, but the magistrate notes that the commission remains the arbiter of weight and probative value of such evidence, and it is not the magistrate's role in a mandamus action to reweigh the evidence and reject Drs. Reed and Feibel's reports in favor of those of Drs. Freedman and Rozen.  The commission had full discretion to rely on Dr. Reed's continued assessment that Wolfe could not return to work based upon the allowed conditions.

{¶ 61} Turning to the commission's authorization of treatment in the form of an EMG of the lower left leg, there is a three-prong test for authorization of most medical services in connection with a claim: (1) are the medical services reasonably related to the allowed conditions; (2) are the medical services reasonably necessary for treatment of the allowed conditions; and (3) is the cost of the medical services reasonable in relation to the medical benefit thereof. *State ex rel. Miller v. Indus. Comm.*, 71 Ohio St.3d 229, 232 (1994). Only the latter two factors are argued here. Again, the magistrate is not permitted to reweigh the medical opinion evidence that the requested EMG was medically necessary and related to the allowed conditions.

{¶ 62} DeCapua finally argues that, if medical evidence supports TTD, Wolfe has lost her claim to such compensation because she has voluntarily abandoned the workforce. Wolfe's testimony before the DHO that she had not worked anywhere after September 27, 2016 is not rebutted or opposed in this case. The question when assessing the propriety of TTD is whether Wolfe had voluntarily abandoned the workforce due to her pregnancy. The SHO concluded otherwise, finding that Wolfe's condition worsened due to ongoing tendon issues after surgery and the additionally allowed condition of deep vein thrombosis.

{¶ 63} Ohio's governing case law for voluntary abandonment in TTD cases has been unsettled in recent years. In response, the Ohio legislature then passed H.B. No. 81, which modified R.C. 4123.56 by adding the following entirely new language:

> (F) If an employee is unable to work or suffers a wage loss as the direct result of an impairment arising from an injury or occupational disease, the employee is entitled to receive compensation under this section, provided the employee is otherwise qualified. If an employee is not working or has suffered a wage loss as the direct result of reasons unrelated to the allowed injury or occupational disease, the employee is not eligible to receive compensation under this section. *It is the intent of the general assembly to supersede any previous judicial decision that applied the doctrine of voluntary abandonment to a claim brought under this section.*

(Emphasis added.) R.C. 4123.56(F), effective Sept. 15, 2020.

{¶ 64} The first question to resolve in a voluntary abandonment case is a determination of the governing law, since the legal standards for TTD eligibility may be drawn from recent Supreme Court of Ohio cases, or to the contrary H.B. 81's new language

that expressly supersedes those cases. Although the outcome in the present matter might not vary, the choice of law is still a threshold issue. The parties, as requested by the magistrate, have provided well-reasoned additional briefing and agree that H.B. 81 does not apply here, and the magistrate also agrees as discussed below.

{¶ 65} The retroactive validity of new R.C. 4123.56(F) has yet to be examined by the judges of this court. In reviewing such legislative enactments, this court therefore undertakes review as a matter of first impression. *State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, ¶ 8. R.C. 1.48 provides: "A statute is presumed to be prospective in its operation unless expressly made retrospective." *See Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 105 (1988). While Article II, Section 28 of the Ohio Constitution prohibits the retroactive impairment of vested substantive rights, the General Assembly may make retroactive any legislation that is merely remedial in nature. *Consilio* at ¶ 9, citing *State v. LaSalle*, 96 Ohio St.3d 178, 2002-Ohio-4009, ¶ 13, and *State ex rel. Slaughter v. Indus. Comm.*, 132 Ohio St. 537, 542 (1937). Thus, courts apply a two-part test to evaluate whether statutes may be applied retroactively. First, the court determines as a threshold matter whether the statute is expressly made retroactive. *Consilio* at ¶ 10, citing *LaSalle* at ¶ 14, citing *Van Fossen*, 36 Ohio St.3d 100, at paragraphs one and two of the syllabus. Then, if the statute is clearly intended to be retroactive, the court determines under the Ohio Constitution whether the statute is substantive or remedial, and if retroactive application impairs a vested contractual right. *Consilio* at ¶ 10, citing *LaSalle* at ¶ 14; *Hope Academy Broadway Campus v. State Dept. of Edn.*, 10th Dist. No. 07AP-758, 2008-Ohio-4694, ¶ 11-12.

{¶ 66} Applying principles of judicial restraint, the magistrate applies the above test only to the specific facts and posture of the present case: does the statute apply to TTD awards in which both the injury and a final adjudication by the commission occurred before the effective date of the new law?

{¶ 67} The magistrate concludes that the first factor is not met in the present case because the legislature did not clearly express an intent for the new language of R.C. 4123.56(F) to apply retroactively. The statute does specify that it is intended to supersede past judicial decisions on the question, and those past decisions are therefore a nullity going forward. The statute does not expressly say that it must be applied to cases

currently under consideration but on facts arising before enactment of the statute, or that past cases decided under former law are now wrongly decided. In the absence of such specific language, the strong presumption against retroactivity must be applied. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, ¶ 9, quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

{¶ 68} Even if the statute were taken as retroactive, it would not conform to the constitutional limitation. A statute is impermissibly retroactive in effect if it takes away or impairs rights that vested or accrued before the statute came into force, or it attaches a new disability in respect to past transactions or considerations. *State ex rel. Matz v. Brown*, 37 Ohio St.3d 279, 281 (1988). "A statutory provision that attaches a new disability to a past transaction or consideration is not invalid unless the past transaction or consideration is not invalid unless the past transaction or consideration created at least a 'reasonable expectation of finality.' " *Hope Academy*, at ¶ 12, quoting *Matz* at 281. While there is little precedent addressing the question, there is no reason to doubt that an award of TTD reflects a substantive right. The commission decided that right under the governing law as it perceived it, DeCapua initiated the present action with similar expectations, and the parties have argued the matter accordingly. To apply new statutory law midstream would work more than a remedial change to the law.

{¶ 69} The present matter will therefore be decided under the most recent controlling case from the Supreme Court of Ohio. An older line of cases from the Supreme Court states that, when a claimant was disabled at the time of retirement, resignation, or other termination of employment, the inability to work due to allowed conditions was the essential factor, and overrode any facially voluntary aspect of the subsequent unemployment. *State ex rel. Reitter Stucco, Inc. v. Indus. Comm.*, 117 Ohio St.3d 71, 2008-Ohio-499; *State ex rel. Pretty Prods., Inc. v. Indus. Comm.*, 77 Ohio St.3d 5 (1996). In other words, "a claimant can abandon a former position of employment only if the claimant was physically capable of doing that job at the time of the alleged abandonment." *State ex rel. OmniSource Corp. v. Indus. Comm.*, 113 Ohio St.3d 303, 2007-Ohio-1951, citing *Pretty Prods.* Under this line of cases, even if the abandonment appeared voluntary, there would

still be a consideration of the degree of disability at the date of termination. *Reitter Stucco* at ¶ 11, citing *Pretty Prods.*

{¶ 70} However, in *State ex rel. Klein v. Precision Excavating & Grading Co.*, 155 Ohio St.3d 78, 2018-Ohio-3890, ¶ 17, decided September 27, 2018 (and therefore prior to the commission's final order in the present case), the Supreme Court expressly overruled its prior decisions in *Reitter Stucco* and *OmniSource*, and partially overruled *Pretty Prods.,* finding those decisions were unworkable in application and led to disparate results. The Supreme Court also concluded that its prior decisions improperly contradicted the fundamental legislative tenet of eligibility for TTD compensation: the industrial injury must be the *cause* of the worker's loss of earnings. *Klein* at ¶ 18. The court in *Klein* installed a bright-line test that applies to bar TTD in cases of voluntary abandonment, without reference to the claimant's physical ability to work. This test would apply across all circumstances, whether the purportedly voluntary abandonment of the worker's position resulted from termination of employment for violation of work rules that clearly define a dischargeable offense, from incarceration, or from retirement. *Id.* at ¶ 19.

{¶ 71} As discussed above, the magistrate concludes that the commission's finding of Wolfe's ongoing inability to work caused by the allowed conditions is supported by some evidence and may not be set aside by a writ. As a result, Wolfe may only be denied TTD if, by becoming pregnant, she voluntarily abandoned the workforce. *Klein*, however, has never been applied in a case in which *pregnancy* is advanced as the intervening event that demonstrated voluntary abandonment. The magistrate concludes that pregnancy is not properly assimilated to the other types of conduct that constitute voluntary abandonment in most *Klein* cases: incarceration, retirement, relocation, terminable safety violations, or intervening non-allowed medical conditions are qualitatively different. More conclusively, a bare *Klein* analysis is impermissible in pregnancy situations because it runs afoul of federal and Ohio law prohibiting discrimination on the basis of sex and pregnancy.

{¶ 72} Among many other prohibitions, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., prohibits employers from taking adverse employment action on the basis of sex. 42 U.S.C. 2000e(2)(a)(1). The federal Pregnancy Discrimination Act ("PDA") added in 1978 a provision to Title VII's definitions section: "The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy,

childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes * * * as other persons not so affected but similar in their ability or inability to work * * *." 42 U.S.C. 2000e(k).  "The most natural way to understand the same-treatment clause is that an employer may not distinguish between pregnant women and others of similar ability or inability *because of pregnancy*.  Here, that means pregnant women are entitled to accommodations *on the same terms* as other workers with disabling conditions." (Emphasis sic.)  *Young v. UPS*, 575 U.S. 206, 242 (2015) (Scalia, J., dissenting on other points.)

{¶ 73} Similarly, Ohio's Fair Employment Practices Act ("FEPA"), codified at R.C. Chapter 4112, prohibits discrimination on the basis of pregnancy; after Congress enacted the PDA amendments to Title VII, Ohio followed suit by enacting an equivalent Ohio Pregnancy Discrimination Act in 1980.  R.C. 4112.02(A) generally provides that it is an unlawful discriminatory practice for any employer "because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  After adoption of Ohio's PDA, R.C. 4112.01(B) states that for the purposes of "divisions (A) to (F) of section 4112.02 of the Revised Code, the terms 'because of sex' and 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy * * *." R.C. 4112.01(B) further provides that "women affected by pregnancy * * * shall be treated the same for all employment-related purposes * * * as other persons not so affected but similar in their ability or inability to work * * *." *See generally*, *Allen v. Totes/Isotoner Corp.*, 123 Ohio St.3d 216, 2009-Ohio-4231, ¶ 24-27; *Priest v. TFH-EB, Inc.*, 127 Ohio App.3d 159, 164-65 (10th Dist.1998).  "Federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) *et seq.*, Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112."  *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.* 66 Ohio St.2d 192, 196 (1981).

{¶ 74} In the present case, the commission addressed the question of voluntary abandonment and assessed the evidence addressing the interplay between physical impact of the allowed conditions and a subsequent pregnancy in weighing whether one or the other

had prevented Wolfe from returning to work. This was one step more than was required. In administrative proceedings before the commission, voluntary abandonment is the equivalent of an affirmative defense against civil claims, and must be pleaded and argued by the employer. *State ex rel. Navistar v. Indus. Comm.*, 160 Ohio St.3d 7, 2020-Ohio-712, ¶ 16, citing *State ex rel. Jenkins v. Indus. Comm.*, 10th Dist. No. 16AP-534, 2017-Ohio-7896. Title VII and FEPA bar DeCapua, a self-insured employer, from asserting a defense to benefits sought by a pregnant claimant when those same benefits would be legally available to similarly situated workers who are not pregnant.

{¶ 75} In summary, because the commission remains the primary arbiter of evidence in a workers' compensation matter, and the commission has considered the question and determined that the medical evidence in this case supports the conclusion that Wolfe's allowed conditions would have rendered her unable to return to her previous position, it was unnecessary for the commission to address the impact of Wolfe's pregnancy upon her TTD eligibility. A claimant in the same position as Wolfe, but not pregnant, would have been eligible for TTD as granted. Federal and state law prohibiting discrimination on the basis of pregnancy preclude treating Wolfe any differently, and preclude the employer raising pregnancy to support the affirmative defense of abandonment. The commission's approval of additional treatment for Wolfe's allowed conditions is supported by some evidence. It is therefore the magistrate's decision and recommendation that the requested writ of mandamus must be denied.

/S/ MAGISTRATE
MARTIN L. DAVIS

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).